FIRST DIVISION

April 22, 2002

No. 1-00-2480

BLUE LINE PUBLISHING, INC., an Illinois ) Appeal from the

Corporation, ) Circuit Court of

) Cook County

Plaintiff-Appellant, )

)

v. ) )

CHICAGO BLACKHAWK HOCKEY TEAM, INC., a )

Delaware Corporation, ) Honorable

) James F. Henry,

Defendant-Appellee. ) Judge Presiding

JUSTICE McNULTY delivered the opinion of the court:

Blue Line Publishing sued the Chicago Blackhawk hockey team, alleging that 
defendant
 violated the Illinois Antitrust Act (the Act) (740 ILCS 10/1 
et seq.
 (West 1992)) by refusing to grant 
plaintiff
 media credentials. 
 Plaintiff
 claimed that the refusal harmed competition for sales of programs for the hockey games.  In an earlier appeal, this court held that the complaint stated a viable claim against 
defendant
 for attempting to monopolize the market for game programs.  
Weinberg v. Chicago Blackhawk Hockey Team, Inc.
, 274 
Ill. App. 3d
 637, 653 N.E.2d 1322 (1995).  The trial court on remand granted 
summary judgment
 in favor of 
defendant
, and 
plaintiff
 appeals.  We affirm because the evidence shows the alleged misconduct does not affect a substantial part of the trade or commerce of this state.

Defendant
 plays about 40 hockey games at home each regular season, plus any playoff games for which the team qualifies.  For each home game, 
defendant
 sells a program listing the lineups and providing statistics and information about the teams competing in that game.

Plaintiff
 first attempted to compete with 
defendant
 for sales of game programs during the 1990-91 hockey season.  Despite repeated requests, 
defendant
 never granted 
plaintiff
 media credentials, and 
defendant
 denied 
plaintiff
 access to players and coaches for interviews.  
Plaintiff
's program, called Blue Line, also provided lineups for the game and information and statistics about the competing teams.  
Defendant
 sold its program inside the building where the game took place, which was either Chicago Stadium or the United Center.  
Plaintiff
 sold its program on streets immediately surrounding the game site.

During the 1990-91 season 
defendant
 sold an average of 770 programs per game, and 
plaintiff
 sold a few hundred per game.  The next season 
plaintiff
 sold between 600 and 1,500 programs at each game, averaging about 1,100 programs sold per game. 
 Defendant
's sales fell to barely 600 programs per game during the regular season, but the sales increased to 900 per game during the team's extended run through the playoffs.

Defendant
's program sales remained in the hundreds per game, rarely exceeding 1,000 for any game for the next several years.  
Plaintiff
 continued printing 1,000 to 1,500 programs for each game and distributing any unsold programs to nearby outlets, for free, after the game.  
Plaintiff
 sometimes had as many as 500 programs unsold.

The price of 
defendant
's program ranged from $3 to $5, while 
plaintiff
 gradually increased the price of Blue Line from $1 per program to $3.50 per program.  While 
plaintiff
's tax returns show modest profits from program sales, 
defendant
's witnesses testified that 
defendant
 never turned a profit on program sales.

The parties presented cross-motions for 
summary judgment
.  The court granted 
defendant
's motion, holding that the programs did not compete against each other in any relevant market.

On appeal, as in the trial court, 
plaintiff
 argues that it presented sufficient evidence that Blue Line competed with 
defendant
's program, providing spectators with information designed to enhance enjoyment of the specific games for which the parties printed each program.  The competition for sales took place inside and immediately outside Chicago Stadium and the United Center.  According to 
plaintiff
, 
defendant
 tried to use its monopoly over National Hockey League games in Chicago to gain a monopoly over sale of programs.  

In the prior appeal this court agreed with 
plaintiff
 that it stated a cause of action for violation of section 3(3) of the Act.  
Weinberg
, 274 
Ill. App. 3d
 at 642-43.  That section provides that persons violate the Act if they:

"Establish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition *** in such trade or commerce." 740 ILCS 10/3(3) (West 1992).

Section 11 of the Act provides:

"When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act."   740 ILCS 10/11 (West 1992).

Applying section 11, this court held that the Act bans the use of power in one market to extract monopolistic advantage in a second market.  
Weinberg
, 274 
Ill. App. 3d
 at 640.

But the Act differs in some respects from federal antitrust law.  The Act specifies that it applies only to monopolies of "any substantial part of trade or commerce of this State."  The Sherman Act (15 U.S.C. §1 
et seq.
 (1994)) has no such restriction.  Neither does the Uniform State Antitrust Act, 7C U.L.A. 359 (2000).

Comments to the Act explain the restriction:

"Section 3(3) prohibits monopolization only when it exists or is attempted with reference to any 'substantial' part of trade or commerce of this State.  The draftsmen recognized that elements of indivisibility must give rise to monopoly.  Many towns are only large enough to support a single hotel, movie theater, or bank, etc., for example.  The draftsmen did not intend to reach a situation of that type.  The word 'substantial' indicates that the area in which a monopoly is unlawfully exercised must be large enough to make the existence of one or more competitors a practical possibility."  740 ILCS Ann. 10/3, Bar  Committee Comments – 1967, at 17-18 (Smith-Hurd 1993).  

Few cases have interpreted the phrase "any substantial part of trade or commerce of this State."  In 
Amalgamated Trust & Savings Bank v. Village of Glenview
, 98 Ill. App. 3d 254, 423 N.E.2d 1230 (1981), Glenview purchased a public water supply system.  The 
plaintiff
 purchased property in the area served by the water supply system, but outside Glenview.  Glenview adopted an ordinance stating that it would not provide water service to properties outside Glenview unless the owner petitioned for annexation to Glenview and conformed to Glenview's land use plans.  The 
plaintiff
 sued Glenview for violation of the Act, and the trial court dismissed the complaint.

The appellate court listed several reasons for affirming the trial court's decision.  The court said:

"[T]here are no facts establishing that Glenview attempted to maintain this alleged monopoly power over 'any substantial part of trade or commerce of this State,' as required by section 3. Rather, the alleged violations occurred only in a single, isolated, unincorporated area outside Glenview."  
Amalgamated Trust
, 98 
Ill. App. 3d
 at 262-63.

Thus, a relevant product market may be too small to warrant application of the Act.

We hold that the market for Blackhawk hockey game programs does not constitute a substantial part of trade or commerce of this state, within the meaning of the Act, and therefore the Act does not apply to the conduct alleged herein.  The relevant market has very limited geographical scope, embracing only a few city blocks in and around Chicago Stadium and the United Center.  The entire market consisted of sales averaging less than 2,000 programs per game for fewer than 50 games per year, with programs costing from $1 to $5 apiece.  The sale of programs apparently had infinitesimal impact on the market for paper and other supplies used for printing the programs.  While the programs provided a forum for advertisement, we cannot construe the impact on advertisement as sufficient to qualify this market as a substantial part of trade or commerce of this state.  The evidence here did not show that the market for Blackhawk programs could support two separate, competing, profitable programs.  

Like the market for movies in a small town, the market for Blackhawk programs is not large enough to warrant the application of the Act.  Accordingly, we affirm the judgment of the trial court.

Affirmed. 

COHEN, P.J. and TULLY, J., concur.